# In the United States Court of Federal Claims

No. 23-330 C
(Filed Under Seal: July 31, 2023)
Reissued: August 21, 2023[*]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*
                                          \*
                                          \*
**PIEDMONT PROPULSION**                   \*
**SYSTEMS, LLC,**                         \*
                                          \*
                              Plaintiff,  \*
                                          \*
        v.                                \*
                                          \*
**THE UNITED STATES,**                    \*
                                          \*
                              Defendant.  \*
                                          \*
        and                               \*
                                          \*
**AIRCRAFT PROPELLER SERVICE,**           \*
**LLC**                                   \*
                                          \*
                    Defendant-Intervenor. \*
                                          \*
\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

*Christopher L. Lockwood*, with whom was *Richard J.R. Raleigh, Jr.* and *Joshua A. Mullen*, Womble Bond Dickinson LLP, all of Huntsville, AL, and *Jerome S. Gabig*, Government Procurement Lawyer, LLC, of Guntersville, AL, for Plaintiff.

*Nathanael Brown Yale*, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, D.C., for Defendant, and *Allen Lotz*, Attorney, United States Coast Guard, of Elizabeth City, North Carolina, and *Richard Tschampel*, Attorney, United States Coast Guard, of Washington, D.C., of counsel.

*Benjamin B. Strawn*, Davis Graham & Stubbs LLP, of Denver, CO, for Defendant-Intervenor.

---

[*] Pursuant to the protective order entered in this case, this opinion was initially filed under seal. The parties provided proposed redactions of confidential or proprietary information, which are redacted in this version of the opinion.  In addition, the Court made minor typographical and stylistic corrections.

## OPINION AND ORDER

**SOMERS**, Judge.

On March 7, 2023, Piedmont Propulsion Systems, LLC ("Piedmont") filed a pre-award bid protest seeking to enjoin the United States Coast Guard ("USCG") from proceeding under a solicitation for the overhaul and repair of aircraft propeller components. Piedmont's main concern with the solicitation is the requirement that the contract awardee be a licensee of the Original Equipment Manufacturer ("OEM") of the propellers. Piedmont principally argues that the OEM license requirement unduly restricts competition but ultimately provides eight separate grounds as to why the solicitation should be enjoined. For the reasons set forth below, the Court finds that the USCG's justification for why the inclusion of the OEM license requirement is necessary to meet its minimum needs is unreasonable. As a result, the Court grants Piedmont's motion for judgment on the administrative record, denies the government's and Defendant-Intervenor's cross-motions for judgment on the administrative record, and enjoins the USCG from proceeding with the relevant solicitation.

## BACKGROUND

### A.    Piedmont's Incumbency and the First Solicitation

The USCG operates eighteen "HC-144 Maritime Patrol Aircraft (MPA) each outfitted with two (2) 14RF-37 propeller assemblies." AR 1130. According to the USCG, the maritime patrol and surveillance aircraft ("MPSA") are not general aviation aircraft, but instead are utilized for search and rescue missions and intelligence duties. AR 860. Indeed, they are "programmed to fly 1000 hours annually," and "frequent[ly] operat[e] at lower altitudes and in salt-laden environments." *Id.* In the solicitation at issue in this protest, the USCG seeks a contractor to perform overhaul, repair, and assembly of the 14RF-37 helicopter propellor system, which is manufactured by Hamilton Sundstrand Corporation, a subsidiary of Collins Aerospace ("Collins"). AR 826–32.

From May 19, 2016, until May 18, 2021, Piedmont was the incumbent vendor for the overhaul and repair of the 14RF-37 propeller system, after winning the contract as a small business set aside. AR 67, 70–71. During this time period, the USCG sought repairs on 503 components, and Piedmont estimates that it completed more than 3,000 repairs. AR 897; *see also* ECF No. 24 ("Am. Compl.") ¶ 17; ECF No. 30 ("Pl.'s MJAR") at 5. Near the end of that contract, in 2020, the USCG issued a sources-sought notice as part of a plan to recompete the 14RF-37 contract. AR 25–28. On September 24, 2021, the USCG issued a solicitation (the "First Solicitation") as a small business set-aside and indicated that the contract would be awarded to the "offeror who provides the Best Value to the Government." AR 182–83. Critically, for the first time, the USCG introduced an OEM license requirement, mandating that any prospective offerors "possess and maintain an OEM license and be able to supply depot level overhaul services for the components specified" in a schedule attached to the First Solicitation. *Id.* Both Piedmont and Defendant-Intervenor, Aircraft Propeller Service, LLC ("APS"), submitted bids in response to the First Solicitation. AR 220–311.

2

According to the government, after Piedmont and APS submitted their bids, "at the request of legal, the agency sought to formally document the agency's justification for including the OEM license[] requirement in the RFP." *See* ECF No. 41 ("Gov.'s MJAR") at 6. Thus, on April 19, 2022, Lieutenant Commander Timothy R. Andersen ("LCDR Andersen") reduced to a memorandum the USCG's justification for including the OEM licensee language in the First Solicitation. *See* AR 419–20. He offered several justifications for the requirement. First, according to LCDR Andersen, the USCG's Aviation Logistics Center ("ALC") has a "standard policy for [critical safety items] repair vendor selection [] to choose components [from the] original equipment manufacturer (OEM), a vendor approved by the OEM, or approved by the respective Division Engineering Officer." AR 419. Second, per the understanding of LCDR Andersen, "OEM licensee status provides access to Private/Restricted Action Items (AIs) which an FAA certified Repair Station with a standard technical data subscription would not have access to. Licensee status also gives the vendor direct access to certain OEM proprietary repairs and information, not accessible by non-licensed repair vendors. Furthermore, with direct access to design engineering personnel, an OEM licensee can develop repairs, adjust component limitations and solve a variety of issues associated with service mission profiles, operating environment and inventory management." *Id.* LCDR Andersen also touted the fact that OEM licensed facilities are subject to random audits by Collins to ensure "quality control and procedural conformance." AR 420. Third, LCDR Andersen noted that the USCG's "HC144 Engineering Team was not aware of an OEM licensed facility or of the above noted benefits associated with such a facility" during the prior contracting effort spearheaded in 2015, and that "[h]aving gained the awareness, knowledge, and experience associated with the availability, privileges, capabilities, and unique benefits of an OEM licensed repair facility, HC-144 engineering is committed to apply that knowledge to enhance future long-term propeller repair contracts to ensure the highest level of airworthiness standards for Flight Critical CSI components." *Id.*

Members of the USCG team then evaluated the potential offerors' capabilities to perform the requirements of the First Solicitation, and Piedmont was assigned significant weaknesses because of its lack of status as an OEM licensed repair facility. *See* AR 357 (listing as a "Significant Weakness" that "[Piedmont] did not provide evidence or Memorandum/Letter from OEM stating they are a licensed authorized OEM repair facility"); AR 358 (finding lack of access to "'Private' Action Items (AI)" to be a significant weakness); AR 359 (finding that "[n]o License agreement as OEM Authorized repair/overhaul facility" was a significant weakness). On the other hand, evaluators deemed APS's status as a Collins-licensed repair facility to be a strength. *See* AR 362 ("[APS] provided Memorandum/Letter from OEM stating they are *licensed* authorized repair facility."); AR 364 (finding that a letter "designating APS as an OEM authorized repair and overhaul facility" was a "Strength"). After finalizing evaluations, the USCG negotiated pricing with APS, *see* AR 435–83, and, on June 8, 2022, it issued pre-award notices announcing that it intended to award the contract to APS. *See* AR 540–41. Piedmont immediately requested a debriefing, *see* AR 542, which the USCG provided on June 28, 2022, *see* AR 596–98. The USCG explained to Piedmont that it "failed to comply with the [Statement of Work] and capabilities" because there was no evidence that Piedmont was a Collins licensee and Piedmont did not "provide a Planned Approach to performance of the SOW." AR 597–98.

On June 13, 2022, Piedmont filed a protest with the Small Business Administration ("SBA") pursuant to FAR § 19.302, contending that APS was not a small business and was, therefore, ineligible for the contract it was awarded. *See* AR 599–628. On June 21, 2022, the SBA dismissed the protest on standing grounds, explaining that the contracting officer had eliminated Piedmont from consideration. AR 629 ("[O]nly an 'offeror that the contracting officer *has not eliminated from consideration for* any procurement-related reason, such as . . . technical unacceptability . . .' may file a protest." (citing 13 C.F.R. § 121.1001(a)(i))). After the SBA denied the protest, Piedmont urged the contracting officer to independently file a size protest, contending that "APS is affiliated with a large business that has $7 billion in revenue and more than 60,000 employees." Pl.'s MJAR at 13 (citing AR 666). The contracting officer did not pursue the size protest, and Piedmont filed a post-award bid protest in this Court on July 15, 2022. *See* Complaint, *Piedmont Propulsion Systems, LLC v. United States*, No. 1:22–cv–769 (Fed. Cl. filed July 15, 2022) ("*Piedmont I*"), ECF No. 1. On September 1, 2022, the government filed a notice that it was taking corrective action and would be moving to dismiss Piedmont's bid protest, AR 692–93, and, on September 8, 2022, Piedmont filed a Notice of Voluntary Dismissal, *Piedmont I*, ECF No. 38.

## B.    The Second Solicitation

After the voluntary dismissal of *Piedmont I* and opting against proceeding under the First Solicitation, the USCG issued a sources sought notice on October 13, 2022, AR 711, to which four entities responded: (1) APS, (2) Collins, (3) Piedmont, and (4) ▮▮▮▮▮▮▮▮▮▮, AR 714–58, 990.[1] Thereafter, on January 25, 2023, the USCG completed a market research report, AR 775–798, which it later revised on February 2, 2023, AR 1130–42. The report concluded that "there are no small business sources in the commercial marketplace that possess the OEM license required to satisfy this requirement [and that] [t]he marketplace consists of two (2) potential sources capable of performing the identified services." AR 1137. The research report reiterated much of the reasoning included in the April 2022 memorandum justifying the OEM license requirement and similarly concluded that Piedmont was not qualified to bid because it lacked an OEM license from Collins. AR 1132–33. On February 10, 2023, the USCG requested that the SBA allow it to issue the forthcoming solicitation without a set aside for small businesses because there was no small business that was also a Collins licensee. AR 820–23. The SBA agreed to allow the USCG to issue the solicitation as unrestricted because the USCG's

---

[1] In addition, on October 24, 2022, the USCG issued Solicitation No. 70Z03823QL0000006 ("Interim Solicitation"), seeking overhaul and repair of eighteen blades and two hubs. AR 1006. On October 28, 2022, Piedmont filed an agency-level protest to the Interim Solicitation with the USCG, raising many of the same arguments it does in this case, and mainly contending that the requirement that an offeror be an "OEM authorized repair facility" violates the Competition in Contracting Act ("CICA"), 41 U.S.C. § 3301, *et seq*. AR 991–1005. Upon review, the USCG's Head of Contracting Activity denied Piedmont's protest of the Interim Solicitation. AR 1127. Specifically, the USCG determined that "this was a relatively small procurement that was executed to enable the USCG to continue its mission preparedness while it plans, solicits, evaluates, and negotiates a larger procurement." *Id.* Because the USCG already agreed to take corrective action in response to Piedmont's protest of the First Solicitation, the USCG explained that the Interim Solicitation was "intended to permit the aviation community within USCG to continue operating safely and expeditiously." *Id.*

contention that there are "no identified [small businesses] with the capability of meeting the USCG's requirements is supported by the revised [market research report]." AR 824–25.

The USCG formally issued Solicitation No. 70Z03823RL0000001 (the "Second Solicitation") on February 14, 2023, which included as a minimum requirement a slightly revised OEM licensee clause: "[s]ources must be the OEM or provide documentation they are an OEM licensee and be able to supply depot level overhaul services for the components listed in the attached Scheduled of Supplies/Services . . . ." AR 832. The statement of work appended to the solicitation further provided, among other requirements, that:

> [t]he contractor shall be authorized and capable of performing all requirements of an OEM licensee as referenced in the Hamilton Sundstrand CMM . . . . The contractor shall have access and authorization to perform proprietary repairs developed by the OEM to include, Major Repairs, and repairs indicated in the CMM AI Log for both Public and Private/Restricted status . . . . The contractor shall have a formal agreement for technical assistance from the OEM which provides access to design level technical data, repair drawings and engineering authority required to develop or co-write new repairs, A[I]s and/or justify repairs/actions beyond that listed in the CMM to maximize the serviceability and longevity of USCG components. The formal agreement from the OEM shall be supported via the licensee designation which authorizes the contractor to perform repairs or deviations to Design Critical Characteristics when warranted/directed by the OEM.

AR 861.

On March 6, 2023, Piedmont and ███████████ separately submitted letters to the USCG explaining that they were small businesses that intended to bid on the Second Solicitation and that the "Rule of Two" requires that the solicitation be set aside for a small business. AR 896–900. The contracting officer provided a brief response to Piedmont on March 8, 2023, stating that "[t]he set-aside determination is made by the Contracting Officer. The effort is solicited appropriately, based on conducted market research." AR 1151.

## C.    The Current Protest

On March 7, 2023, Piedmont filed the instant pre-award protest challenging the Second Solicitation. *See generally* ECF No. 1. After Piedmont filed its motion for judgment on the administrative record seeking injunctive relief, *see* ECF No. 30, the government moved this Court to remand the action back to the agency, *see* ECF No. 33. Specifically, the government wanted to investigate the organizational conflict of interest ("OCI") allegations set forth in Piedmont's amended complaint and motion for judgment on the administrative record. Am. Compl. ¶¶ 114–19; Pl.'s MJAR at 31–34. Piedmont opposed remand, *see* ECF No. 34, and the Court denied the government's motion because (1) the OCI issue had already been brought to the attention of the USCG and (2) Piedmont asserted seven additional grounds as to why the USCG committed error in the Second Solicitation, *see* ECF No. 35 at 2–3.

Although Piedmont contests the propriety of the Second Solicitation on eight different grounds, they stem from the USCG's inclusion of the OEM license requirement, which Piedmont contends is unduly restrictive on competition. Pl.'s MJAR at 2, 24–30. In addition to directly protesting the OEM license requirement, Piedmont also argues that the OEM license requirement is: an unjustified brand name requirement in violation of FAR subpart 6.3, *id.* at 3, 30–31, the product of an OCI, *id.* at 3, 31–34, a qualification requirement that fails to comport with FAR subpart 9.2, *id.* at 3, 34–35, and a violation of FAR § 12.302(c) because it is not consistent with customary commercial practices, *id.* at 3, 35–38. Additionally, Piedmont contends that the Rule of Two mandates that the Second Solicitation be set aside for small business, *id.* at 3, 38–39, that the Second Solicitation constitutes improper bundling precluding the participation of small businesses, *id.* at 3, 40–41, that the contracting officer violated CICA by failing to promote competition and obtain the most advantageous contract for the government, *id.* at 3, 41–43, and that the USCG violated FAR part 10 because its market research did not properly consider the abilities of small business offerors, *id.* at 3, 43–44. Because of these alleged errors, Piedmont also moves the Court to enjoin the USCG from proceeding under the Second Solicitation. *Id.* at 45–47.

The government filed a cross motion for judgment on the administrative record contending that "the record firmly establishes that the solicitation's [OEM license] requirement is rationally related to the Coast Guard's need to ensure the highest levels of airworthiness for the flight critical parts and components at issue in this contract." Gov.'s MJAR at 18. According to the government, the record provides concrete, real-world examples of the benefits associated with an official Collins license. *Id.* at 19–20. The government also addressed each of Piedmont's other protest grounds. *Id* at 26–45. Piedmont filed a response to the government's cross motion for judgment on the administrative record, *see* ECF No. 44 ("Pl.'s Resp."), and the government filed a reply brief, *see* ECF No. 47 ("Gov.'s Reply"). Defendant-Intervenor, APS, also filed a cross-motion for judgment on the administrative record and a reply. *See* ECF Nos. 40 and 46.[2] The Court held oral argument on the parties' motions on June 15, 2023. *See* ECF No. 38.

## DISCUSSION

### A.   Standard of Review

This Court reviews the USCG's decision-making under the standards set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *see also* 5 U.S.C. § 706. The

---

[2] APS's cross-motion simply elaborates on an example of a repair that it was able to complete successfully. *See generally* ECF No. 40. This elaboration is provided in a declaration from one of APS's employees, which it has tried to introduce in this case via a motion to supplement the administrative record. *See* ECF No. 39. Furthermore, APS's reply only more briefly discusses the declaration that it proposes should be included in the record. *See generally* ECF No. 46. Because the Court denies APS's motion to supplement the administrative record, *see* Conclusion *infra*, APS's cross motion is essentially a nullity. Moreover, even if the Court did consider APS's briefing and the material it moved to supplement the administrative record with, it would have little overall bearing on the outcome of this case, which, as discussed below, turns on the USCG's lack of understanding of the nature of the OEM license requirement.

Federal Circuit has defined a two-part test to determine the merits of a bid protest under the APA standard. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). First, the protestor must show that the agency action in question is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Accordingly, Piedmont satisfies this prong of the test if either "the procurement official's decision lacked a rational basis" or "the procurement procedure involved a violation of regulation or procedure." *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020) (quoting *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). Second, "[t]o prevail in a bid protest, a protestor must show a significant, prejudicial error in the procurement process." *Id.* (quoting *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)).

The Federal Circuit has explained that demonstrating prejudicial error in pre-award bid protests can be a unique endeavor. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed. Cir. 2009) (discussing how in pre-award cases "it is difficult for a prospective bidder/offeror to make the showing of prejudice that we have required in post-award cases"). While in a pre-award case there is no contract award forming the basis of a "'but for' prejudice analysis[,] . . . Article III considerations require a [plaintiff] to make a showing of *some* prejudice." *Id.* (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Recognizing this, the Federal Circuit has held that a "prospective offeror could establish the prejudice necessary for standing by showing 'a non-trivial competitive injury which can be redressed by judicial relief.'" *Id.* (citing *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998)); *see also SH Synergy, LLC v. United States*, 165 Fed. Cl. 745, 758 (2023) (citing *Am. Relocation Connections, L.L.C. v. United States*, 789 F. App'x 221, 228 (Fed. Cir. 2019)) (explaining that the standard has been described as "something akin to the 'harmless error' rules that courts apply in ordinary civil cases" and that the "protestor must demonstrate a greater-than-insignificant chance that correcting the agency's errors could lead to a different result").

Moreover, in reviewing an agency's procurement decisions, the Court's task is not to "substitute its judgment for that of the agency." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971); *see also Weeks Marine, Inc.*, 575 F.3d at 1368–69 (quoting *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000)) (stating that under "'highly deferential' rational basis review," courts will "sustain an agency action 'evincing rational reasoning and consideration of relevant factors'"). Rather, the protestor "bears a heavy burden," and the agency is "entitled to exercise discretion upon a broad range of issues . . . ." *Impresa Construzioni*, 238 F.3d at 1332–33 (citations omitted). Nonetheless, the application of the APA standard requires the Court to intervene in cases in which agency action is unreasonable. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 374 (1998) ("Not only must an agency's decreed result be within the scope of its lawful authority, but the process by which it reaches that result must be logical and rational.") (citation omitted). Furthermore, the agency must "not only have reached a sound decision, but have articulated the reasons for that decision." *In re Sang Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002). Thus, the Court must examine the evidence in the record to determine "whether the decision was based on the relevant factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park*, 401 U.S. at 416.

Finally, bid protests are generally decided on cross-motions for judgment on the administrative record pursuant to Rule 52.1 of the Rules of the United States Court of Federal Claims, which requires the Court to "make factual findings from the record evidence as if it were conducting a trial on the record." *Bannum*, 404 F.3d at 1354. "Unlike a motion for summary judgment, a genuine dispute of material fact does not preclude a judgment on the administrative record." *Id.* at 1355–56. Therefore, in reviewing cross-motions for judgment on the administrative record, the Court "asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *Jordan Pond Co., LLC v. United States*, 115 Fed. Cl. 623, 630 (2014) (citing *Bannum*, 404 F.3d at 1356–57).

## B.    Analysis

Although Piedmont raises several arguments in support of its protest of the Second Solicitation, at bottom, this protest really concerns whether the USCG understood what it was requiring when it limited competition to either the OEM or a licensee of the OEM. According to the USCG, its minimum needs could only be satisfied by having the repair work set forth in the solicitation be completed by Collins (the OEM) or APS (the only OEM licensee for the 14RF-37 propeller system). However, as is explained in greater detail below, the USCG—at least based on the information included in the administrative record—did not have a clear understanding of what it means to be a Collins OEM licensee in general or, more importantly, an OEM licensee for the 14RF-37 propeller system. Without this understanding, the USCG simply did not know whether requiring the contractor be an OEM licensee is necessary to meet its minimum needs. Accordingly, based on the administrative record before the Court, the inclusion of the OEM licensee requirement in the Second Solicitation was irrational.

Separately, the USCG has not investigated an OCI issue that Piedmont raised in this protest. On May 10, 2023, the government moved to remand this OCI issue to the USCG for investigation and evaluation. The Court denied that request based largely on the fact that Piedmont raised seven additional grounds—each independent of the OCI issue—in this protest. *See generally Piedmont Propulsion Sys., LLC v. United States*, No. 23-330 C, 2023 WL 3441782 (Fed. Cl. May 12, 2023). The government renewed its remand request in its cross-motion, and as explained below, the Court will order the investigation of the OCI issue as part of the injunctive relief granted herein.

### 1.    The Appropriate Legal Standard Under the Competition in Contracting Act

As stated above, the primary issue in this bid protest is whether the USCG has violated CICA by including the OEM license requirement in the Second Solicitation. Before addressing the merits of whether the OEM license requirement unreasonably restricts competition, the Court must first address the government's argument that the correct legal standard for review of the USCG's minimum needs determination (*i.e.*, the OEM license requirement) is to examine whether it "is *so plainly unjustified* as to lack a rational basis." Gov.'s MJAR at 16 (emphasis added) (citing *Savantage Fin. Servs., Inc. v. United States*, 595 F.3d 1282, 1286–87 (Fed. Cir. 2010)). While not entirely clear from its cross-motion, the government appears to contend that this standard provides agencies with even *more discretion* than the normal rational basis review applied by this Court in bid protests. *Id.* at 16–18; Gov.'s Reply at 3–4. In response, Piedmont

argues that the government is attempting to impermissibly heighten the standard for rational basis review by selectively poaching language from one solitary Federal Circuit opinion, which has never again been relied upon or quoted by the circuit.  Pl.'s Resp. at 2–4.  According to Piedmont, the examination of whether a solicitation requirement unduly restricts competition is subject to the ordinary rational basis review standard and, in this case, focuses on whether the OEM licensee requirement is rationally "required to meet the Government's minimum needs." *Id.* at 4 (emphasis omitted) (citing *Am. Safety Council, Inc. v. United States*, 122 Fed. Cl. 426, 435 (Fed. Cl. 2015)).

The Court agrees with Piedmont that the standard to be applied to Piedmont's protest of the OEM license requirement is the ordinary rational basis review regularly applied by judges of this Court in bid protests.  This does not appear to be the first time that the government has urged a judge of this Court to apply the government's preferred "so plainly unjustified" standard in a bid protest involving a question regarding restricting competition.  Indeed, in another protest brought by Savantage Financial Services, different from the one the government cites to here, Judge Hertling discussed which standard to employ in evaluating whether a solicitation "is unduly and unlawfully restrictive of competition."  *Savantage Fin. Servs., Inc. v. United States*, 150 Fed. Cl. 307, 317 (2020).  As is the case here, the government argued before Judge Hertling that a solicitation is unduly restrictive when it "is *so plainly unjustified* as to lack a rational basis." *Id.* (emphasis added) (quoting *Savantage*, 595 F.3d at 1286–87) (emphasis added). Likewise, the plaintiff there contended that the solicitation should be reviewed under the ordinary rational basis standard.  *Id.*  Judge Hertling determined that there is "no meaningful distinction between the two formulations: under both approaches, the focal point is whether the agency's decision 'lacks a rational basis.'"  *Id.* (citing *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1358 (Fed. Cir. 2015)).  Although the Court does not believe that applying the government's preferred standard would lead to a different result in this case, the Court will not deviate from the normal rational basis standard based on a few words of a concluding sentence pulled from one Federal Circuit opinion—words the circuit has never quoted again.

This is especially the case given that the section of the opinion from which the government derived its preferred standard clearly indicates that the circuit was actually applying the ordinary rational basis standard:

> In a bid protest case, an agency's action must be set aside if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005); *see also* 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A).  The court's task is to determine whether "(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1358 (Fed. Cir. 2009).  Savantage does not allege a procedural violation, but argues that DHS's restrictions on the solicitation lacked a rational basis and were therefore unlawful.

> Contracting officers "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  *Impresa Construzioni Geom.*

> *Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  For that
> reason, procurement decisions "invoke[] 'highly deferential' rational basis review."
> *CHE Consulting, Inc. v. United States*, 552 F.3d 1351, 1354 (Fed. Cir. 2008).
> Under that standard, we must sustain an agency action unless the action does not
> "evince[] rational reasoning and consideration of relevant factors."  *Advanced Data
> Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000).  Upon review
> of the record in this case, we agree with the trial court that there is a rational basis
> for the three contested requirements of the new solicitation . . . .

*Savantage Fin. Servs.*, 595 F.3d at 1285–86.  In other words, the circuit's recitation of the standard of review in the government's sole case on this point, does not discuss whatsoever the need for a decision to be "so plainly justified" in order to survive rational basis review.

What is more, the full quote of the language the government points to in support of its "heightened-heightened" standard of review states that the circuit "*agree*[*s*] *with the trial court that Savantage has failed to meet its burden* of showing that the agency's decision to require a fully integrated system is so plainly unjustified as to lack a rational basis."  *Id.* at 1286–87 (emphasis added).  Yet, one would be hard pressed to find anything related to being "so plainly unjustified" in Judge Futey's opinion to which the circuit is noting its agreement with the standard applied.  *See generally Savantage Fin. Servs., Inc. v. United States*, 86 Fed. Cl. 700 (2009).  One will not find such language because it simply is not the correct standard of review and the circuit—judging, *inter alia*, by the cases it cited prior to the one conclusory sentence cited by the government—did not believe that it was applying the extra-heightened standard the government urges this Court to apply.

Accordingly, in order to determine whether the OEM license requirement unduly restricted competition, the Court will assess whether the USCG had a rational basis for including it in the Second Solicitation while giving the USCG the deference to which it is entitled and no more.  In conducting this review under CICA, the Court "examin[es] whether a particular procurement requirement unduly restricts competition [and] inquires whether the restrictive requirement[] [is] required to meet the government's minimum needs."  *Parcel 49C Ltd. P'ship v. United States*, 130 Fed. Cl. 109, 125 (2016); *see also* 41 U.S.C. § 3306(a)(2)(B) ("Each solicitation under this division shall include specifications that . . . include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the executive agency or as authorized by law."); 10 U.S.C. § 3206(a)(2)(B).  If the Court determines, which it does, that the OEM license requirement "violates the prohibition against restrictive terms that are not required to meet the government's minimum needs, the requirement [will be] deemed to be unduly restrictive and [the] agency's decision to include the requirement in the solicitation will be found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Parcel 49C Ltd. P'ship*, 130 Fed. Cl. at 125.

## 2.     The USCG's Decision to Include the OEM License Requirement Lacked a Rational Basis

The Second Solicitation's OEM license requirement challenged by Piedmont provides that: "[s]ources must be the OEM or provide documentation they are an OEM licensee and be

able to supply depot level overhaul services for the components specified in the attached Schedule of Supplies/Services 70Z03823 RL0000001." AR 832. Although the USCG admits that "this requirement does restrict competition," it nonetheless argues that "it does not unduly restrict it." *See* AR 474. Piedmont, on the other hand, contends that the OEM license requirement is unduly restrictive because the USCG has failed to show how the OEM license requirement is necessary to meet the USCG's minimum needs. Pl.'s MJAR at 24–30.

Although Piedmont is challenging the Second Solicitation, which was published on February 14, 2023, a version of the OEM license requirement initially appeared in the First Solicitation, which was disseminated on September 24, 2021. *See* AR 104 ("Sources must possess and maintain an OEM license and be able to supply depot level overhaul services for the components specified in the attached Schedule of Supplies/Services . . . .").[3] Crucially, the justification for including the OEM license requirement in the First Solicitation—LCDR Andersen's April 2022 justification memorandum[4]—also largely provides the justification for the USCG's inclusion of the OEM license requirement in the Second Solicitation. AR 419–20. Titled "Justification for Requiring HC 144 Propeller Component Repair Vendor to be a Collins Aerospace Licensee," LCDR Andersen's justification memorandum, along with portions of a few other documents in the administrative record, identifies several benefits the USCG believed it was obtaining by limiting competition for the repair of the 14RF-37 propeller system to the OEM or an offeror with an OEM license. As summarized by the government in its MJAR, the USCG believed the OEM license requirement provided:

> (1) access to restricted action items that a mere FAA certified repair station with a standard data subscription would not have access to; (2) direct access to certain OEM proprietary repairs and information not accessible to non-OEM licensees; (3) the ability to work with the OEM through direct access to "develop repairs, adjust component limitations and solve a variety of issues associated with service mission profiles, operating environment and inventory management;" (4) . . . unannounced compliance audits conducted by the OEM; and (5) . . . conform[ance] with ALC's standard policy for repair of critical safety items[:] . . . select[ing] the OEM of the component [or] a vendor approved by the OEM[] or by the Coast Guard's Engineering Department.

Gov.'s MJAR at 19 (citing AR 419–20, 1130, 1132–33, 715–17, 74–78).

These supposed benefits of being OEM licensed appear to have been important to the USCG because, as explained by the USCG, its eighteen HC-144 aircraft "are operated differently from general aviation in support of USCG operations which consist of Search and Rescue, Surveillance and Reconnaissance missions . . . . [that] require frequent operation at lower altitudes and in salt-laden environments." AR 860. Furthermore, "HC144 14RF-37 propeller components . . . are classified as Critical Safety Items (CSI), in that failure, malfunction or

---

[3] The Second Solicitation included, for the first time, language that the offeror could also be the OEM. *Compare* AR 104 (First Solicitation) *with* AR 832 (Second Solicitation).

[4] LCDR Andersen's April 2022 justification memorandum was created just over six months after the First Solicitation was issued and, therefore, likely would have constituted a post-hoc rationalization in a theoretical protest of the First Solicitation.

absence could cause an uncommanded engine shutdown or catastrophic failure resulting in the loss [of,] or serious damage to[,] the aircraft." AR 419. In short, it appears that the USCG wanted the contractor for this procurement to have the highest possible access to proprietary repairs, technical information, and other benefits that, according to the USCG, only the OEM or an OEM licensee could obtain—particularly as it relates to major repairs and critical safety components.

However, although theoretically it may be reasonable for the USCG to seek to limit competition to contractors that can provide the highest possible access to proprietary repairs, technical information, and other benefits related to critical safety items, the administrative record in this case does not support the USCG's conclusion that an OEM license actually provided these benefits. Rather, communications between the USCG and Collins that supply the crucial support for the April 2022 justification memorandum simply do not provide a rational basis for including the OEM license requirement in the solicitation. This is because the USCG, at least based on the administrative record before the Court, does not actually know what exactly is included in the sole OEM license agreement for 14RF-37 propeller system repairs.

According to the administrative record, the USCG first inquired about the OEM license requirement in 2021. From May to August of 2021, Collins had been reaching out to the USCG team to discuss the forthcoming First Solicitation and the capabilities of Collins' own maintenance, repair, and operations ("MRO") facility in Maastricht, Netherlands. AR 1252–76. Specifically, on May 28, 2021, a representative from the Collins MRO facility explained that "[s]ince we are the only global 14RF MRO site owned [by] Collins Aerospace, the OEM of your HC-144 propeller system, our Maastricht Airport facility based in The Netherlands is the only site globally that has the capability and ability [of] performing any property repair in-house." AR 1252. In response, on June 1, 2021, the USCG asked, "[r]egarding the USCG HC-144 propeller assembly 14RF, are there currently proprietary repairs specific to the 14RF that ONLY Collins as the OEM can perform?" AR 1251. The Collins MRO facility representative confirmed that *only* the OEM MRO facility "is fully capable to perform any and all proprietary repairs in-house . . . . For example the taper bore repair to the propeller blade, a very critical repair no one else is authorized to perform except ourselves in Maastricht." AR 1250. He continued,

> Collins Aerospace have appointed a 3rd party licensee based in the US called APS, whom we have licensed to perform 14RF MRO activity as well as being authorized for a number of propriet[ar]y repairs, *however not all and every repair*. In case they have to have certain exclusive propriet[ar]y repairs performed, they will in turn have to direct those parts to us in Maastricht. *I'm not aware of any other 3rd party facility having the OEM approval to perform propriet*[ar]*y repairs*."

*Id.* (emphasis added). Despite this information, the USCG included the OEM license requirement in the First Solicitation, and only sought bids from offerors who "possess and maintain an OEM license and [are] able to supply depot level overhaul services for the components specified." AR 183. Notably, this requirement excluded even the OEM MRO facility from competition. *Id.*

While the 2021 email correspondence between the USCG and representatives from Collins seems to demonstrate that the USCG did not know what exactly it was requiring when it limited the field of offerors for the First Solicitation to OEM licensees, the USCG asked Collins additional questions about the OEM license in advance of the Second Solicitation. However, rather than clarify what it means to be an OEM licensee for the 14RF-37 propeller system, the answers to these questions further confirm that the USCG did not understand exactly what it means to be an OEM licensee for the propeller system.

Initially, on February 14, 2022, the USCG team listed a number of repair and overhaul line items and asked for a "list of Authorized overhaul/repair facilities for the components listed below." AR 689–91. These part numbers appear to be included in the 2016 solicitation, which Piedmont won. *Repair/Overhaul of HC-144 Aircraft Propeller Components* (Solicitation No. HSCG38–16–Q–010018 listing same part numbers).[5] Instead of providing the information the USCG asked for, a Collins representative informed the USCG that "Piedmont is authorized by the FAA to perform work per our CMM's," and provided the USCG with the locations at which Collins itself could perform the requested work. *See* AR 687–88. Notably, the Collins representative provided no information regarding the capabilities of any OEM licensee in response to the question the USCG posed.

Next, in an email chain from LCDR Anderson to a Collins representative that began on April 14, 2022, LCDR Anderson asks "what additional information [Collins] could provide regarding what it means to be a 'Collins Aerospace Licensed repair facility.' There is some detail in the attached APS company description, but wanted to see if you have any documents that are from the OEM perspective on this designation. Either related to the process for licensure, capabilities, or privileges associated with it." AR 417.[6] After some back and forth, on April 19, 2022, LCDR Andersen followed up on his initial request by asking the Collins representative,

> [u]ltimately what we are looking for is any Collins documentation of the program. Is there a public letter, website page or brochure that describes the program? . . . . Would the Private AIs for our application also be a part of the proprietary information that a Licensee would have access to? Or do all FAA certified Repair facilities have access to the private AIs? Essentially any formal documents . . . would be helpful for our effort . . . . Again we are just trying to show justification to legal and contracting teams as to why the stipulation [requiring] our propeller overhaul facility to be a Collins Aero Licensed facility is valid and justified.

AR 416. The Collins representative provided a limited response to LCDR Andersen's questions by email and, at some point, agreed to send LCDR Andersen a letter regarding the OEM license for the propeller system. The Collins representative even agreed to "wordsmith" the letter to fit

---

[5] Available at https://sam.gov/opp/d8ade6e2296592f55c07d7c852fb5fe7/view (last visited July 19, 2023).

[6] Interestingly, LCDR Andersen asked for this basic information "regarding what it means to be a 'Collins Aerospace Licensed repair facility,'" AR 417, after he had already initially drafted the justification memorandum, *see* AR 392–93 (initial justification memorandum dated April 7, 2022).

LCDR Andersen's needs.  *See* AR 415 ("How is this?  I have no problem wordsmithing it to fit your needs.").

Ultimately, on April 19, 2022, the Collins representative, in response to LCDR Andersen's request, provided the USCG with a letter that gives some limited information about APS's license agreement for the 14RF-37 propeller system and attaches to that letter "an old Service Information Letter (SIL)" for a different propeller system than the one at issue.  AR 422–32.  The letter explains that "[a]s a licensee[,] Aircraft Propeller Services (APS) is provided *certain* technical support not provided to other repair shops[, which] includes, but is not limited to, exclusive rights to proprietary repairs we may have developed for these specific model propellers."  AR 422 (emphasis added).  It appears that the information from the April email chain and this letter contributed significantly to LCDR Andersen's April 2022 justification memorandum, which stands as the memorialization of the USCG's reasoning for including the OEM license requirement in the Second Solicitation.  AR 419–20.

Despite LCDR Andersen's April 2022 justification memorandum, the USCG continued to reach out to Collins for further clarification on what it meant to be an OEM licensee for the 14RF-37 propeller system.  For instance, after Piedmont filed its first protest in this Court challenging its exclusion from competition under the First Solicitation, which caused the USCG to take corrective action, the contracting officer reached out to a Collins representative in October 2022.  The contracting officer asked a number of questions to prepare for the issuance of the Second Solicitation with the OEM license requirement:

> Can you tell me what companies are authorized repair facilities in the US for Collins?  We have 144 propeller blades, o-rings, etc.  What does it mean to be a licensee?  What is the difference between being a licensee and an authorized repair facility?  What are advantages to being a licensee?  An authorized repair facility?  Please be as detailed as possible.  If you have questions[,] please let me know.

AR 1286.  The contracting officer had additional questions on October 18, 2022:

> I do have a couple of other questions.  Can you tell me what the difference is between purchasing a subscription to the CMMs and actually being an OEM licensed repair facility for Collins?  Can you explain the perks of each status?  Also, if there are items that Collins is the OEM that can't be repaired, are both of these categories able to send the items to Collins for repair or receive instructions?

AR 1283.  The USCG is once again asking the right questions to assess the benefits of a Collins OEM license.  The problem, however, as will be discussed in more detail below, is that the answers the USCG received from Collins do not support a rational conclusion that the "restrictive provision[] . . . [is] necessary to satisfy the needs of the agency."  41 U.S.C. § 3306(a)(2)(B).

In response to the USCG's October 2022 questions, Collins indicated that "APS was appointed as a licensee for maintaining our propeller systems in a US location" and is the "sole global licensee for Collins Aerospace propeller systems."  AR 1147, 1149.  Moreover, Collins

informed the USCG that the main benefit of the license is the "formal authorization by the OEM to perform MRO services in a defined geographical area." AR 1149 ("The main advantage to working with a licensee is its geographical location."). As explained by Collins, when an OEM-licensed "MRO facility is closer to your operating base compared to the location of the OEM MRO facility, this will help our customers in reducing shipping time and associated transport costs."[7]  *Id.*

However, importantly for the Court's analysis here, beyond confirming that APS was the sole OEM licensee for the propeller system and touching on some of the advantages that provides, Collins provided the USCG with several pieces of information that were contrary to the USCG's justification for determining that an OEM license was necessary to meet the USCG's minimum needs. For instance, Collins informed the USCG that the "main advantage [of] working [with Collins instead of a licensee or third party MRO] is that *all* repair action which could possibly be required can be performed inside [Collins'] facility and under [Collins'] control, including all propriet[ar]y repairs required." *Id.* (emphasis added). In addition, Collins plainly told the USCG that there are "certain repairs which the OEM considers 'critical' in light of flight safety [that] are only allowed to be performed by the OEM MRO facility, the so-called propriet[ar]y repairs." *Id.* For these critical, propriet[ar]y repairs, "[w]hen a licensee inspects a component and detects that a propriet[ar]y repair is required, it must ship the subject component out to the OEM MRO facility to have this repair performed . . . . [For example,] [t]he 14RF blades have a specific propriet[ar]y repair which can and must only be performed at our Maastricht facility in The Netherlands." *Id.*[8]  In case the above information was not clear to the USCG, Collins reiterated it a couple weeks later: "there will be certain propriet[ar]y repairs that

---

[7] Although in that same correspondence, the Collins representative even offers an argument as to why proximity to the customer offered by the OEM licensee may not be superior to dealing directly with Collins:

> [S]hipments to The Netherlands and back to the US are really going fast and efficient, these are sizeable units too. From [a] logistics point of view, we are literally just 2 days away from Elisabeth City using Fedex or the likes. The transportation costs shipping to Europ[e] will need to be taken into consideration versus using a facility based in the US. I hope our fast turn times coupled with high efficiency and effectivity will offset these incremental shipping costs. Would we be able to prevent one Hub or one Blade going "scrap" that will cover for quite some overseas shipments.

AR 1149.

[8] Again, this was simply confirmation of information that was relayed to the USCG in 2021, before the First Solicitation was published. Remember, on June 1, 2021, Collins informed the USCG that it "owns 1 (one) MRO facility globally which is fully capable to perform any and all proprietary repairs in-house. This is our MRO campus at Maastricht Airport in The Netherlands, being the Collins Aerospace 'Center of Excellence['] for propeller systems . . . . *[T]here are proprietary repairs which only our OEM owned Maastricht MRO facility is capable and authorized to perform*." AR 1242 (emphasis added). Furthermore, Collins explained that "Collins Aerospace have appointed a 3rd party licensee based in the US called APS, whom we have licensed to perform 14RF MRO activity as well as being authorized for a number of propriet[ar]y repairs, *however not all and every repair. In case they have to have certain exclusive propriet[ar]y repairs performed, they will in turn have to direct those parts to us in Maastricht. I'm not aware of any other 3rd party facility having the OEM approval to perform proprietary repairs*." AR 1242–43 (emphasis added).

can only be performed by Collins.  So when it is found that such repair is needed following inspection, that will require the 3rd party MRO or our licensee a PO to us and have this repair done." AR 1147.  In other words, at least based on the documentation in the administrative record, the more questions the USCG asked in advance of the Second Solicitation, the more it should have realized that simply having an OEM license may not actually provide all of the benefits that the USCG invoked to justify the restrictive OEM license requirement.

Rather, even if it could be rational to include an OEM license requirement in the solicitation, the information the USCG gleaned from Collins in October 2022 certainly does not support the reasoning for the OEM license requirement set forth in the justification memorandum.  The memorandum lauds APS's access to "restricted action items" and "certain OEM proprietary repairs," but the USCG does not know if APS's access includes repairs and information that the USCG needs to service the 14RF-37 propellers.  In other words, "[t]he purpose of the licensing clause . . . is not connected to the goal of the Solicitation," which is to ensure airworthiness of critical safety components.  *See Am. Safety Council, Inc.*, 122 Fed. Cl. at 437.

Moreover, the justification memorandum also indicates that periodic audits from Collins and the ability to work directly with the OEM further support the need to contract with a Collins licensee.  AR 419–20.  However, the USCG does not explain why the audits from Collins assist it in meeting its minimum needs more than the audits to which Piedmont is subject.  *See* AR 752–53 (listing forty-eight audits of Piedmont in 2021, several of which were accomplished by government agencies such as the Department of the Navy and the FAA).  Additionally, the justification memorandum's vague references to the benefits of a licensee's direct access to the OEM do not concretely differentiate it from other third parties' ability to send items to Collins for repair.  *See* AR 792.

Furthermore, in early 2023, just over a month before the USCG issued the Second Solicitation, Collins made clear that being an official OEM licensee does not provide universally known benefits because "[*d*]*epending on the specific license*, a licensee *may be entitled* to Private Action items and/or other OEM Proprietary Technical Data, direct technical support from our company, and potential audits." AR 1144 (emphasis added).[9]  It is true that in correspondence conducted earlier in 2022, a Collins representative indicated that access to proprietary repairs and technical data are the "biggest item[s]" that are generally included in a license agreement; however, exactly which proprietary repairs and what technical support is provided is detailed "pursuant to the specific license agreement." AR 1042.  Because according to Collins it enters into unique license agreements with differing terms, simply requiring an offeror to be a Collins licensee means little without additional context.  Making matters worse here, the government admits that it never viewed the actual license agreement between APS and Collins, and the agreement is conspicuously absent from the administrative record.  *See* Pl.'s

---

[9] In this January 5, 2023, email, Collins reiterates that only the OEM MRO facility can offer certain benefits and services.  *See* AR 1144 ("We are the only facility that is allowed and capable to perform any and all propriet[ar]y repairs as may be required on the 14RF propeller system . . . . Furthermore, being [a]n integrated part of the OEM, this automatically ensures direct access to service engineering, when issues would arise that are outside of the manual specifications.").

MJAR at 10.[10]  In other words, the USCG did not know what it was "buying" when it included the OEM license requirement in the Second Solicitation.  Because access to repairs and data are seemingly different in any given Collins' license agreement, the USCG did not act rationally in requiring the contractor to be an OEM licensee.  The USCG simply did not know whether an OEM license for the 14RF-37 propeller system included access to benefits that were necessary to meet its minimum needs.

If the USCG had reviewed the license agreement that APS entered into with Collins, or received firm answers to the questions it posed to Collins—including exactly which repairs an OEM licensee could complete on the 14RF-37 propeller—perhaps requiring offerors to be OEM licensed would be rational.  But, instead of reviewing the actual license agreement or gaining a full understanding of what repairs APS could and could not perform by virtue of the licensee agreement and as compared to a third-party vendor like Piedmont, the USCG added the OEM licensee requirement to the Second Solicitation without knowing what that requirement actually meant.  Because the USCG did not actually understand what APS's capabilities were as an OEM licensee, especially in relation to other third-party repair facilities with access to Collins' CMM, placing the OEM license requirement in the solicitation was unreasonable, especially where—as here—that requirement limited competition.

What is more, the USCG's attempt to justify the OEM license requirement by asserting that it did not include such a requirement in the previous contract for which Piedmont was the awardee because it did not know at the time that an OEM repair license facility existed is also irrational.  According to LCDR Andersen's justification memorandum, the "HC144 Engineering Team was not aware of an OEM licensed facility or of the above noted benefits associated with such a facility" during the prior contracting effort spearheaded in 2015, and that "[h]aving gained the awareness, knowledge, and experience associated with the availability, privileges, capabilities, and unique benefits of an OEM licensed repair facility, HC-144 engineering is committed to apply that knowledge to enhance future long-term propeller repair contracts to ensure the highest level of airworthiness standards for Flight Critical CSI components."  AR 420.  Although it may be true that the USCG was unaware that there was an OEM licensed repair facility when it competed the previous contract, surely the USCG had to be aware that there was an OEM and that the OEM repaired its own propeller systems.  Yet, the USCG did not sole source the previous contract to the OEM or award that contract to the OEM after an open competition.  Thus, to say that the lack of awareness of the existence an OEM licensed facility when the previous contract was competed prevented the USCG from taking advantage of the benefits such a facility provided, when all of those benefits (and more) could have been provided by the OEM itself, does not appear to be a rational conclusion for the USCG to have drawn as to why the previous contract was awarded to Piedmont.

The Court takes no position as to whether it was possible to rationally include the OEM license requirement in the Second Solicitation or in a future solicitation.  It may be that, if fully informed regarding what it means to be a Collins licensee for the 14RF-37 propeller, the USCG could rationally conclude that the OEM license requirement is necessary to meet its minimum

_____

[10] See Oral Argument at 48:28 (COURT: "Is the license in the administrative record somewhere?" GOV. COUNSEL: "No, your Honor, the license isn't in the administrative record.").

needs.  It is not the Court's role to determine an agency's minimum needs and how those needs shall be met.  *See Parcel 49C Ltd. P'Ship*, 130 Fed. Cl. at 126.  However, based on the record presented here, the USCG did not have a rational basis for concluding that OEM licensee status was necessary to meet its minimum needs.

Finally, it is clear that the USCG's error of irrationally including the OEM license requirement in the solicitation prejudiced Piedmont.  To demonstrate prejudice in a pre-award protest, especially one such as this in which the protestor has been excluded from competition, a protestor must show that it has suffered a "non-trivial competitive injury."  *See Weeks Marine, Inc.*, 575 F.3d at 1361–62.  Here, Piedmont has easily established that inclusion of the OEM license requirement has caused it a non-trivial competitive injury.  But for the inclusion of that restrictive requirement in the Second Solicitation, Piedmont would have been able to compete for award of the propeller system repair contract.  *See Orion Tech., Inc. v. United States*, 704 F.3d 1344, 1349 (2013) (finding prejudice where "had the [government] not excluded [protester's] proposal, [protester] could have likely competed for the contract"); *accord SOS Int'l LLC v. United States*, 127 Fed Cl. 576, 586 (2016) ("This Court has held that a non-trivial competitive injury exists if the plaintiff has been 'deprived of the opportunity to fully and fairly compete.'") (citing *Magnum Opus, Inc. v. United States*, 94 Fed. Cl. 512, 531 (2010)).

### 3. Because the Court Finds that the OEM License Requirement is Not Rationally Related to the USCG's Minimum Needs, the Court Should Avoid Deciding Piedmont's Other Closely-Related Protest Grounds

In addition to its principal argument regarding the unduly restrictive nature of the OEM license requirement, as well as its OCI argument (discussed below), Piedmont raises a number of additional reasons as to why the Second Solicitation lacked a rational basis or was otherwise contrary to law.  Piedmont contends that the Second Solicitation's OEM license requirement imposes a qualification requirement in violation of FAR subpart 9.2, *see* Pl.'s MJAR at 34–35; that it violates FAR § 12.302(c) because it is inconsistent with customary commercial practices, *id.* 35–38; and that it is a brand requirement that fails to comply with FAR §§ 6.302-1(c), 6.303, and 6.304, *id.* at 30–31.  Additionally, Piedmont argues that the Rule of Two mandates that the Second Solicitation be set aside for small businesses, *id.* at 3, 38–39; that the Second Solicitation constitutes improper bundling preventing small business participation, *id.* at 3, 40–41; and that the USCG violated FAR part 10 because its market research did not properly consider the capabilities of potential small business offerors, *id.* at 3, 43–44.

Piedmont's arguments regarding qualification requirements under FAR subpart 9.2, branding under FAR subpart 6.3, and customary commercial practices pursuant to FAR § 12.302(c), all flow directly from the USCG's inclusion of the irrationally justified OEM license requirement discussed above.  Because the Court concludes that the OEM license requirement, as currently constructed and justified, violates CICA as unduly restrictive, the Court should avoid addressing these closely related arguments.  *See Elevated Techs., Inc. v. United States*, 160 Fed. Cl. 257, 273 n.7 (2022) ("The Court need not address [protestor's] other protest ground . . . [because] its protest can be sustained on the basis that [defendant-intervenor's] quote should have been disqualified.").  In addition to the fact that the Court need not address these other arguments because it has found error in the USCG's violation of CICA, it would also be

imprudent to do so when these alleged errors may be remedied by a new or amended solicitation that addresses the irrationality that presently exists with the OEM license requirement.  For example, as currently written and justified, the OEM license requirement may in fact be a qualification requirement pursuant to 41 U.S.C. § 3311(a) and thus must comply with FAR subpart 9.2.  However, if the USCG can properly justify the requirement as necessary to meet its minimum needs under the terms of a new solicitation, then perhaps the OEM license requirement no longer meets the statutory definition of a "qualification requirement."  *See* 41 U.S.C. § 3311 ("[T]he term 'qualification requirement' means a requirement for testing or other quality assurance demonstration that must be completed by an offeror before award of a contract.").  Or perhaps the USCG will dispose of the OEM license requirement, negating these additional protest grounds altogether.  In any event, the Court finds it imprudent and fruitless to rule upon all of the other contentions of error put forth by Piedmont at this juncture.

Furthermore, Piedmont's arguments regarding small business issues and market research likewise flow from the fact that Piedmont was excluded from participating in the Second Solicitation due to the OEM license requirement.  *See NI Indus., Inc. v. United States*, 841 F.2d 1104, 1108 n.3 (Fed. Cir. 1988) ("[Protestor] makes arguments relating to other grounds on which it believes the CO abused her discretion.  Having found illegality and an abuse of discretion inherent in the CO's reliance on regulations promulgated in violation of the APA, we need not address these other grounds.").  Accordingly, the Court should also avoid addressing these arguments that are based on a solicitation provision the Court has determined does not, at least based on the record before it, rationally meet the USCG's minimum needs.

### 4.      The USCG is Enjoined From Proceeding Until It Conducts an OCI Investigation

In count two of its amended complaint, Piedmont alleges that LCDR Andersen's justification memorandum, AR 419–20, is the product of a biased ground rules OCI.  Am Compl. ¶¶ 115–16.  Specifically, Piedmont alleges that correspondence between LCDR Andersen and Collins' representatives constitutes hard facts of the existence of an OCI because Collins has a "direct financial interest in channeling work to" APS, which is purportedly "paying 'huge and nonrefundable license fees.'"  *Id.* ¶ 118.

As described above, based on Piedmont's allegation, the government earlier moved the Court to remand this protest back to the USCG so that it may investigate the potential OCI.  *See* ECF No. 33.  The Court denied that motion.  *See Piedmont Propulsion Sys., LLC*, 2023 WL 3441782.  In its cross-motion for judgment on the administrative record, the government reiterated its request that the Court remand Piedmont's "claim to the Coast Guard to conduct the investigation that Piedmont contends is missing from the record, and for a determination of whether any potential OCI violation can be avoided or mitigated."  Gov.'s MJAR at 41.  The government also takes time to respond to the Court's order that pondered why the USCG had not yet investigated the OCI allegations which were previously raised at the agency-level.  *See* ECF 36 at 2–3.  After the government supplemented the administrative record to include additional emails (following a request by Piedmont), it explained that Piedmont's amended complaint filed on April 14, 2023, was the first time its biased ground rules claim "included 'getting the Coast Guard to change the procurement to full and open thus allowing Collins Aerospace to compete.'"

Gov.'s MJAR at 44 (citing Am. Compl. ¶ 24).  According to the government's cross-motion, Piedmont now "highlights the potential OCI in Collins' participation as a potential offeror (as opposed to Piedmont's more limited original argument that Collins had a financial interest in funneling the work to APS through its license agreement)."  *Id.* at 44.

The Court understands the government's position and agrees that Piedmont's newly refined OCI allegations and arguments should be investigated.  However, rather than maintain jurisdiction over this protest while remanding the OCI issue to the USCG, because the Court has determined that the OEM license requirement unduly restricts competition, at least as currently justified, the Court will enjoin the USCG from proceeding with the current OEM license requirement until the USCG investigates Piedmont's allegations of a biased ground rules OCI.

### 5.      Piedmont is Entitled to Injunctive Relief

In order to determine if a permanent injunction is warranted, the Federal Circuit has articulated a four-part test that requires the Court to consider whether:

> (1) the plaintiff has succeeded on the merits of the case; (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) the public interest is served by a grant of injunctive relief.

*Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing *PGBA, LLC v. United States*, 389 F.3d 1219, 1228–29 (Fed. Cir. 2004)).  Because, as discussed above, Piedmont has succeeded on the merits of this protest, the Court turns to the three remaining injunctive relief factors.  *See Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 999 & n.13 (Fed. Cir. 2018) ("[P]roving success on the merits is a necessary element for a permanent injunction, [but the court] may balance the remaining three *Centech* permanent injunction factors—irreparable harm, balance of hardships, and public interest—when deciding whether to grant or deny injunctive relief . . . .").

Turning first to irreparable harm, Piedmont argues that the harm it has incurred is the lost chance to fairly compete for the contract.  Pl.'s MJAR at 45.  It is well-established that in a pre-award bid protest, the "[l]ost opportunity to compete in fact constitutes irreparable harm for purposes of injunctive relief."  *eSimplicity, Inc. v. United States*, 162 Fed. Cl. 372, 381 (2022); *see also T Square Logistics Servs. Corp. v. United States*, 134 Fed. Cl. 550, 560 (2017); *RLB Contracting, Inc. v. United States*, 118 Fed. Cl. 750, 761 (2014), *aff'd*, 621 F. App'x 1026 (Fed. Cir. 2015).  Because the USCG's error caused Piedmont to be "entirely removed from competition without recourse, . . . [Piedmont] will suffer irreparable harm if injunctive relief is not provided."  *See G4S Secure Integration LLC v. United States*, 161 Fed. Cl. 387, 418–19 (2022).

Next, "the Court must determine whether the balance of hardships to the government in issuing an injunction outweigh[s] the harms to [Piedmont]."  *Id.* at 419 (citing *PGBA*, 389 F.3d at 1229).  The Court has already found that Piedmont is harmed, and the government does not raise

any harm it will incur if injunctive relief is granted.  *See* Gov.'s MJAR at 47–48; *see also* Pl.'s Resp. at 28.  As a result, the balance of the hardships weighs in favor of Piedmont.

Finally, the Court must consider whether the public interest is served by granting injunctive relief.  Bid protest decisions regularly recognize that "there is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations."  *Hosp. Klean of Tex., Inc. v. United States*, 65 Fed. Cl. 618, 624 (2005).  Piedmont argues that, in this case, injunctive relief serves the public interest by ensuring tax dollars are wisely spent and that small business rules are appropriately enforced. Pl.'s MJAR at 46.  The government asserts that this factor weighs in its favor because the procurement process was not compromised here.  Gov.'s MJAR at 48.  The Court finds that this factor tilts in favor of Piedmont because it has demonstrated that the USCG's justification for the OEM license requirement, which limits competition (including by excluding small businesses), is not rational.  *See Sierra Nevada Corp. v. United States*, 154 Fed. Cl. 424, 441 (2021) ("[A]n injunction to enforce procurement law and preserve competition as much as possible serves the public interest.").  As a result, the Court will enjoin the USCG from proceeding under the Second Solicitation as outlined in more detail below.

## CONCLUSION

For the reasons set forth above, the Court orders the following:

1.      The government's and APS's respective cross-motions for judgment on the administrative record are **DENIED**;

2.      Piedmont's motion for judgment on the administrative record is **GRANTED**, and its request for injunctive relief is **GRANTED** as follows:

a.      The United States, including the United States Coast Guard, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from proceeding with the solicitation at issue in this protest for the repair of the 14RF-37 propeller system unless and until the OEM license requirement at issue in this case is removed or the United States is able to justify, in a manner that is consistent with this opinion, that the inclusion of such a provision is necessary to meet its minimum needs;

b.      Furthermore, the United States, including the United States Coast Guard, its officers, agents, and employees, is hereby **PERMANENTLY RESTRAINED AND ENJOINED** from proceeding with the solicitation at issue in this protest, or any other solicitation for repair of the 14RF-37 propeller system that limits competition to the OEM and/or an OEM licensee, until the United States Coast Guard investigates the OCI allegations made by Piedmont in this protest, including those first raised in the Amended Complaint;

3.      Both Piedmont's and APS's respective motions to supplement the administrative record are **DENIED**.[11]

4.      The Clerk shall **ENTER** final judgement accordingly.

**IT IS SO ORDERED.**

s/ Zachary N. Somers
ZACHARY N. SOMERS
Judge

---

[11] On May 26, 2023, APS moved to supplement the administrative record with a declaration from one of its employees, with work orders attached thereto, which APS contended would help the Court understand the work APS performed and "provide[] insight into the importance of utilizing an OEM-licensee." ECF No. 39 at 2.  Later, on June 2, 2023, Piedmont filed its own motion to supplement the administrative record with a May 22, 2023, interim solicitation ("Second Interim Solicitation") issued by the USCG for the repair of the 14RF-37 propeller system, which does not require offerors to be OEM licensees. *See generally* ECF No 43.  Although the USCG later updated the Second Interim Solicitation's statement of work to include the OEM license requirement, Piedmont contends that the document will aid judicial review "because it shows the Court just how easily the Coast Guard could issue a solicitation that would enable Piedmont to compete." *Id.* at 3.  The government opposed each motion, arguing that neither party established that the administrative record was "insufficient to permit meaningful judicial review." ECF Nos. 48 at 3 & 49 at 3; *see also Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1380 (Fed. Cir. 2009) ("Supplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." (internal quotations omitted)).  The Court concurs with the government—neither motion seeks to include information that would assist this Court with judicial review.  APS' motion simply includes additional detail from APS regarding hub repairs that are already discussed in the record.  *See* AR 393, 1133, 1147.  Because APS does not seek to "correct mistakes [or] fill gaps," the Court denies its motion to supplement the administrative record. *See CliniComp Int'l, Inc. v. United States*, 134 Fed. Cl. 736, 746 (2017) ("[T]his Court has precluded supplementation of the administrative record with declarations that contain post-hoc contentions of fact and argument." (internal quotations and citation omitted)).  Likewise, Piedmont's argument that the issuance of an incorrect statement of work demonstrates that the USCG could issue a solicitation without the OEM license requirement does not aid judicial review; therefore, its motion to supplement the record with a withdrawn version of the Second Interim Solicitation is denied.